UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ORBIAN CORPORATION LIMITED,<br><br>        Plaintiff,<br><br>v.<br><br>BURNS & LEVINSON, LLP and JOSEF VOLMAN,<br><br>        Defendants. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

Plaintiff Orbian Corporation Limited ("Orbian"), through its attorneys, brings this Complaint and Jury Demand against Defendants Burns & Levinson, LLP ("B&L") and Josef Volman ("Volman") (hereafter, collectively, "Defendants"), and alleges as follows:

### Introduction

1. This is an action for legal malpractice and breach of fiduciary duty that stems from a law firm abusing its role as trusted company counsel. Defendants repeatedly deviated from the applicable standards of care to Plaintiff's detriment.

2. Josef Volman, partner at B&L, had a close relationship with James Houston ("Houston"), General Counsel for Orbian, dating back to the early 1990s. Beginning in or about 2008, Orbian used B&L's legal services regularly at the behest of its General Counsel, Houston.

3. In or around March 2020, Houston approached B&L and Volman for help crafting a restated participation agreement ("RPA") between himself and Orbian that would entitle Houston to a payout equal to roughly 4% of the value of the company. In a series of covert and severely unethical negotiations, B&L and Volman helped Houston push through a one-sided RPA at the

expense of their own client, Orbian. This misconduct included, but was not limited to: Volman and Orbian secretly communicating and strategizing behind the back of Orbian's Chairman, Thomas Dunn ("Mr. Dunn"); Volman submitting fraudulent timesheets that billed Orbian for time he spent giving Houston advice that directly conflicted with Orbian's interests; and B&L and Volman repeatedly failing to disclose to Orbian that they followed biased, secret instructions from Houston when rendering legal advice regarding the RPA.

4. Plaintiff is now involved in multiple legal proceedings against Houston, who has since been terminated for cause for various violations of company policies and failure to obey Mr. Dunn's directives, as required by his employment agreement. Defendants' misconduct resulted in an RPA that contains no explicit provision protecting the company from having to reward Houston's egregious misconduct with a windfall equal to approximately 4% of the value of the company, despite his termination for engaging in a years-long pattern of deeply problematic and harmful behavior. Additionally, the RPA allowed Houston to enter into, and receive $800,000 under, a Loan Agreement ("Loan Agreement") predicated on his expected payouts from the RPA—a loan that Houston now refuses to repay. Consequently, Plaintiff has been forced to seek redress against Houston in the U.S. District Court for the Southern District of California at considerable expense. Plaintiff seeks to recover for all damages caused by Defendants' abject negligence and breach of duties.

## Parties, Jurisdiction and Venue

5. Plaintiff Orbian is a limited partnership organized under the laws of Bermuda with headquarters in London, United Kingdom. The Company maintains one North American office, located in Carlsbad, California. Orbian is a supply chain finance provider that provides fast and

fully integrated solutions using a combination of a true multi-bank funding model and a state-of-the-art technology platform.

6. Mr. Dunn is the Chairman of Orbian, a role he has held since 2006. He resides in the United Kingdom and works out of Orbian's London office.

7. Houston is an attorney admitted to practice law in New York and California who served as Orbian's General Counsel and Managing Director from August 2007 to June 2023, working out of Connecticut and New York until 2012, then out of California until he was terminated for cause effective July 2023.

8. B&L is a limited liability partnership with its principal place of business in Boston, Massachusetts. B&L is a Boston-based law firm that Orbian utilized sporadically—and always at Houston's urging—between 2014 and 2020 for legal advice on a variety of matters. Critical to this case is B&L's involvement in the execution of the RPA between Orbian and Houston, dated as of April 14, 2020. As of November 1, 2024, B&L is no longer engaged in the practice of law.

9. Defendant Josef Volman was, until May 2024, a partner in B&L's Corporate practice group, and currently serves as a partner at Blank Rome LLP, located in Boston, Massachusetts. Volman received his Bachelor of Arts degree in 1988 from Tufts University and a law degree in 1991 from University of Connecticut School of Law. Volman and Houston have a close personal relationship that dates back at least as far as 1991. Upon information and belief, Volman is a resident of Massachusetts.

10. Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332(a)(4) as the matter in controversy exceeds $75,000 and the controversy is between citizens of a state and a foreign country.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3) as a substantial part of the events giving rise to the claims herein occurred in this judicial district.

### Common Factual Allegations

#### Background

12.     In August 2007, Orbian hired Houston to serve as its General Counsel and as Managing Director. In those roles, Houston was Orbian's chief legal officer and senior employee in the United States. In addition to leading Orbian's global legal department, Houston was responsible for managing Orbian's operations in the United States.

13.     Between 2011 and 2023, Houston and Volman exchanged hundreds of emails about both personal and work-related matters. Their communication topics ranged from sports to potential in-person visits in California, Florida, and New York. On at least two occasions, Volman suggested bringing their respective spouses to these proposed meet-ups. Mr. Dunn and other Orbian personnel were rarely included on these communications and remained unaware of the extent of Houston and Volman's relationship until it was brought to light in June 2023.

14.     Throughout this time period, specifically from 2014 through 2023, Orbian retained B&L and Volman to assist with diligence review, drafting agreements, and various other projects.

#### Defendants Conspire to Push Through A One-Sided RPA for Houston's Benefit

15.     On March 15, 2020, Houston emailed B&L and Volman—with the subject line "Personal Orbian Problem"—to ask for their advice and assistance in connection with a "personal participation agreement for [him] with Orbian." The contemplated RPA was an agreement between Houston and Orbian intended "to compensate Houston for his past, present, and continued contributions to the Orbian Companies in the event of a Qualifying Transaction," generally defined as a monetization of the company.

16. Houston made it abundantly clear in this email that he was approaching B&L and Volman to serve his personal financial interests at the expense of Orbian. Notably, as of March 2020, Defendants had represented Orbian repeatedly over the years and had never represented Houston in his individual capacity. In contacting Defendants about the RPA, Houston was attempting to leverage his control over the selection of outside counsel for Orbian to work to his personal advantage, and Defendants knew or should have known as much.

17. In a chain of emails hidden from Orbian, Houston confided in Volman that he "had a whole argument with Tom [Dunn] over [the RPA] Friday, and I had to threaten to resign," immediately indicating to Defendants that Houston's personal interests were in conflict with those of their long-standing client, Orbian.

18. Houston proceeded to tell Volman, "I am trying cover off on all potential transactions *they could do* and state whether *I get paid*, and then whether (only in 1 case) it *dilutes my Payout* (which is 4% of Orbian valuation when I turn 65 – which is the main feature of this thing in all cases)."[1]

19. Houston then directed Volman to review the agreement in order to "make sure they [Orbian] have no way around paying it," emphasizing that "I don't want them getting around me," and to "*just make sure they have no way around paying it*."

20. At no point did B&L and Volman indicate to Houston—or to Mr. Dunn or anyone else at Orbian—that his request presented a severe conflict of interest, given their representation of Orbian.

21. Instead, Volman proceeded to advise Houston personally on the RPA, billing his time to *Orbian* as "general corporate advice."

---

[1] All emphasis in the Complaint is supplied.

22. Primarily concerned with remaining in Houston's good graces to obtain further business from Orbian, Defendants failed to admonish Houston that their client had always been Orbian, not Houston individually, or that the advice he was requesting constituted a conflict of interest. Nor did Defendants make any effort to speak with Mr. Dunn or anyone else at Orbian other than Houston to get a fully informed waiver of the conflict.

<u>Defendants Conduct a Biased Review of the RPA as Company Counsel for Houston's Benefit</u>

23. In or around April 2020, Orbian, through Houston, formally retained Defendants to review the RPA as ***company counsel*** and determine whether the terms were fair and appropriate. Defendants did not disclose to Mr. Dunn or anyone else at Orbian that just one month earlier, Houston had asked Volman to review an iteration of the RPA with Houston's financial interests in mind, or that Houston was a longtime personal friend of Volman's.

24. On April 15, 2020, Houston emailed Volman and Mr. Dunn indicating that Orbian would like to "get a review" of the RPA from Volman "as Company counsel . . . to determine that there will be no untoward, inequitable consequences to either party." Houston went on to explain that he and Mr. Dunn "believe a once-over by you as company counsel would be prudent," emphasizing—with Mr. Dunn in copy—that Volman's job was to protect both sides, despite requesting the exact opposite of Volman in his March 15, 2020 emails.

25. Houston followed up moments later with an email dropping Mr. Dunn from the conversation. Houston noted, "I am not of a mind to get into to [sic] much further back and forth – seems fair to me from my standpoint but my big concern would be ***not to leave too much wiggle room.***" Houston explicitly acknowledged the impropriety of his secret efforts to persuade company counsel to serve his personal financial interests, saying, "Not trying to put you [Volman] in a bad (or any) position here… "

26. Volman failed to notify Mr. Dunn about this communication, in clear breach of his duties to his client.

27. Houston concluded by saying, "Just wanted you to know we weren't expecting too many 'comments' or suggestions unless you saw a real what could be a sore thumb sticking out – then please go ahead and suggest a solution," again clearly indicating to Volman that he was to rubber-stamp the agreement, rather than dutifully and thoroughly review it with a view toward protecting his client, Orbian.

28. Indeed, Houston encouraged Volman to do the bare minimum in his review of the RPA and Volman acquiesced, no questions asked, despite the clear conflict of interest and the fact that Mr. Dunn, as non-lawyer, and foreign citizen unfamiliar with United States law, was relying heavily on Volman's expertise to protect Orbian. In short, Mr. Dunn relied on Defendants to protect Orbian, but Defendants exploited this trust to safeguard Houston's personal financial interests and ensure that Houston continued to refer Orbian business to them.

29. On April 16, 2020, Volman emailed Houston that he "didn't hear from Tom [Dunn]. I assume you want me to respond to both of you in my email response and you don't need me to reach out to him separately?" Clearly, asking Houston, his nominal adversary in negotiations, for permission to contact the Chairman of his own client, demonstrates that Defendants' loyalty was to Houston, not their client, Orbian.

30. On April 17, 2020, having been secretly briefed on Houston's goals and interests, having been instructed by Houston to conduct a superficial review of the RPA, and having failed to contact Mr. Dunn separately to determine the company's views and objectives, Volman emailed Mr. Dunn and Houston, stating, "I have reviewed the [RPA], and it is very thorough and straightforward and the examples on the exhibit are comprehensive." Mr. Dunn thanked Volman

and stated that "given the nature of the agreement [he] thought it best to have a ***trusted external counsel*** check it," reaffirming that Volman's participation was intended to offset any potential inequity that could have resulted from Houston, an experienced U.S. lawyer, being the primary drafter and negotiator of the RPA with Mr. Dunn, a non-lawyer and foreign citizen unversed in U.S. law. Defendants never informed Orbian that B&L had only conducted a review of the RPA subject to the directions provided by Houston and had been secretly communicating with him to ensure that his personal interests were protected and implemented instead of Orbian's.

31. Defendants did not revise, suggest, or apparently even consider including in the RPA any basic safe harbor provisions that would have allowed Orbian to avoid paying Houston 4% of the company's value under the sort of extraordinary circumstances that led to his termination for cause (i.e., discovery of Houston's incessant workplace abuse and harassment). Instead, they blindly followed Houston's explicit request that the RPA leave Orbian as little wiggle room as possible, and without any serious attempt to protect Orbian's interests.

<u>In a Clear Conflict of Interest, Defendants Advise Houston Personally on How to Maximize His Payout from Orbian</u>

32. Several months later, Houston came to B&L and Volman, Orbian's counsel both generally and specifically in relation to the RPA, to ask for personal advice on how to handle a conflict between himself and Orbian.

33. Specifically, on or around January 14, 2021, Houston emailed Volman about a transaction that Houston thought could potentially lead to a payout to him under the RPA. Houston immediately acknowledged a conflict with Orbian, noting, "I know 1(c)(iii) [of the RPA] would make me better off in a cash at closing sense, but he's [Mr. Dunn] never going to go for that." He proceeded to ask Volman "if (off the record) you see any better window for me you could point me in that direction," unambiguously indicating he knew the obvious – that his request for personal

advice adverse to Orbian was neither above board nor appropriate. And yet, Defendants did not turn Houston away. They did not apprise Houston that it would be a breach of their duties to their client, Orbian, to assist him personally in a conflict situation. Instead, Defendants proceeded to give Houston advice adverse to Orbian's interest.

34. On January 18, 2021, Volman responded to Houston with advice on the current payment summary in the RPA and offered to speak privately with Houston more on the topic. Defendants intentionally omitted Mr. Dunn from these conversations, never included him in them, and never informed him of them.

35. Volman billed this work to Orbian as "legal document review," intentionally concealing the fact that he reviewed the document to assess how it could best serve Houston's personal interests as opposed to protecting Orbian's.

Lasting Damage of the RPA

36. The fraudulent RPA allowed Houston to realize substantial financial gains, to the detriment of Orbian. On or about December 21, 2021, Houston approached Orbian and Raglan Capital Limited ("Raglan"), a limited liability company affiliated with Orbian that provides corporate finance and investment banking services, and requested a loan against the future payment of amounts he claimed would be due to him under the RPA.

37. Unaware that the RPA had been achieved through fraud and breach of fiduciary duty, Orbian and Raglan agreed. Raglan and Houston entered into the Loan Agreement, which allowed Houston to borrow a maximum of $400,000 per year, until his termination or retirement as defined in the RPA. In total, Houston received approximately $800,000 from Raglan under the Loan Agreement. Of course, all of this was only possible because Houston, through B&L and

Volman, had fraudulently induced Orbian's consent to the flawed and one- sided RPA in the first place.

## Termination of Houston and Subsequent Proceedings

38. On or around May 30, 2023, Orbian was for the first time made aware of complaints regarding Houston's improper behavior within the company. During a visit from California to Orbian's London office, two whistleblowers alleged Houston had been harassing and bullying his underlings in California for years.

39. Orbian promptly commenced a thorough and confidential investigation. During this investigation, Orbian discovered that Houston had engaged in severe misconduct, ranging from verbal abuse to deception of Orbian's most senior management.

40. On September 21, 2023, Orbian provided Houston with written notice of its findings and terminated him for cause under the terms of his Employment Agreement.

41. Raglan demanded repayment for amounts loaned to Houston under the fraudulent Loan Agreement. Houston refused.

42. Orbian is now involved in multiple legal proceedings against Houston in an attempt to remedy the damage it has suffered, much of which has resulted from having entered two agreements (the RPA and the Loan Agreement) without receiving necessary information and unbiased legal advice.

43. In addition to a pending arbitration proceeding in which Orbian and Houston assert claims against each other related to Houston's now-terminated employment, on April 26, 2024, Orbian filed a complaint against Houston in California state court (subsequently removed to federal court) seeking damages for his (inter alia) breach of fiduciary duty, breach of contract, and fraud. The California complaint also seeks a declaration that the RPA was obtained through fraud

and breach of fiduciary duty and should be voided. The parties are currently in the midst of discovery.

## COUNT I
## (Legal Malpractice)

44. Orbian repeats and realleges the facts set forth in the paragraphs above as though fully set forth herein.

45. Defendants had an attorney-client relationship with Orbian.

46. Based on this relationship, Defendants owed a duty of care to Orbian to exercise the care, skill and diligence expected from legal professionals.

47. Defendants fell below the applicable professional standards in their representation of Orbian when they failed to inform Orbian of their conflict of interest, repeatedly hid communications about the RPA from Mr. Dunn, submitted intentionally vague timesheets that billed Orbian for time spent advising its adversary, and did not alert Orbian to the explicitly biased directions they received (and followed) from Houston.

48. As a direct and proximate result of Defendants' misconduct, Orbian has been severely damaged. Orbian is now purportedly bound to an agreement on which it was not adequately advised, and which continues to pose an immense cost to the company. But for Defendants' failures to satisfy their duties of care, Orbian would have been able to obtain an equitable agreement that allowed them to avoid paying Houston 4% of the value of the company if he was found (as here) to have engaged in persistent and egregious misconduct, disobedience, and violations of company policies. Alternatively, properly advised, Orbian would have avoided entering into the RPA altogether if Houston were unwilling to agree to appropriate terms protecting Orbian's interests.

## COUNT II
### (Breach of Fiduciary Duty)

49. Orbian repeats and realleges the facts set forth in the paragraphs above as though fully set forth herein.

50. Defendants owed Orbian a fiduciary duty, as the relationship between attorney and client is a fiduciary relationship as a matter of law. Defendants, as such, owed Orbian a duty of the utmost good faith and loyalty. This included the duty to exercise judgment solely for the benefit of Orbian and free from any compromising influence.

51. Defendants breached their fiduciary duty to Orbian by advancing Houston's personal interests throughout review of the RPA, rather than ensuring the RPA protected Orbian.

52. Defendants had a duty to obtain informed consent from Orbian with regard to the conflict of interest that existed due to the relationship between Houston and Volman. Defendants declined on multiple occasions to inform Mr. Dunn and Orbian that they had reviewed the RPA with the purpose of ensuring terms were the most favorable to Houston.

53. Defendants further breached their fiduciary duty to Orbian by billing the company for personal advice provided to Houston in the face of a clear conflict of interest.

54. Orbian has been substantially damaged as a direct and proximate result of Defendants' breach of its fiduciary duty.

## COUNT III
### (Breach of Contract)

55. Orbian repeats and realleges the facts set forth in the paragraphs above as though fully set forth herein.

56. Defendants and Orbian, through an agreement, course of dealing, and otherwise, entered into a contractual relationship through which Defendants provided legal services to Orbian. Pursuant to that agreement, Defendants were obligated to provide competent legal services in accordance with applicable professional standards of care, as well as to disclose any material information that could affect Defendants' ability to perform under the contract.

57. Orbian fulfilled all its obligations under the contract.

58. Defendants breached this contract when they failed to provide Orbian with competent advice regarding the RPA consistent with the professional standards of care. Defendants further breached the parties' contract by failing to disclose the conflict of interest that existed due to the personal relationship between Volman and Houston, which substantially compromised Defendants' contractual obligation to render competent, fair, and appropriate legal advice to Orbian. Specifically, the Defendants failed to disclose to Orbian that they were not providing advice consistent with Orbian's best interests, and in fact were providing advice based on Houston's personal financial interests.

59. Defendants further breached the parties' contract when they repeatedly communicated with Houston and subsequently followed explicitly biased instructions from Houston that harmed the interest of their client, Orbian, all without informing or including Orbian in any of the correspondence.

60. Orbian has been substantially damaged as a direct and proximate result of Defendants' breach of contract.

**PRAYER FOR RELIEF**

WHEREFORE, Orbian, hereby requests this Court grant the following relief:

1. Enter judgment against Defendants and in favor of Orbian for all damages determined at trial to be caused by Defendants' negligence and breach of fiduciary duty, along with attorney's fees, statutory interest, and costs; and

2. Grant such other and further relief as is just and proper.

**JURY DEMAND**

ORBIAN HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.

        Respectfully submitted,
        For the plaintiff,
        ORBIAN CORPORATION LIMITED
        By its attorneys,

        CADWALADER, WICKERSHAM & TAFT LLP

        /s/ *Michael E. Petrella*
        Sean F. O'Shea
        Sean.OShea@cwt.com
        Michael E. Petrella
        Michael.Petrella@cwt.com
        Matthew M. Karlan
        Matthew.Karlan@cwt.com
        Cadwalader, Wickersham & Taft LLP
        200 Liberty Street
        New York, New York 10281
        (212) 504-6000 (tel.)
        (212) 504-6666 (fax)

        LAWSON & WEITZEN, LLP

        /s/ *Scott P. Lopez*
        Scott P. Lopez, BBO # 549556
        splopez@lawson-weitzen.com
        Lawson & Weitzen, LLP
        88 Black Falcon Ave., Suite 345
        Boston, MA 02210
        (617) 439-4990 (tel.)

Dated: December 20, 2024        (617) 439-3987 (fax)